COLUMBUS IRON & STEEL CO. v. KANAWHA & M. RY. CO.

(Circuit Court of Appeals, Fourth Circuit.  February 14, 1910.)

No. 911.

COMMERCE (§ 89*)—INTERSTATE COMMERCE ACT—REGULATION OF RAILROAD RATES—JURISDICTION OF COURTS.

A Circuit Court of the United States is without jurisdiction to enjoin the filing, publication, or enforcement by a railroad company of an interstate rate, on the ground that it is unreasonable or discriminatory, in advance of action thereon by the Interstate Commerce Commission, which is vested by Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), with exclusive jurisdiction to determine such questions in the first instance.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*]

Appeal from the Circuit Court of the United States for the Southern District of West Virginia, at Huntington.

Suit in equity by the Columbus Iron & Steel Company against the Kanawha & Michigan Railway Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 171 Fed. 713.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The appellee, the Kanawha & Michigan Railway Company, is a West Virginia corporation and a resident of that state, and is an interstate carrier of coal from the Kanawha district therein to the lake ports in the state of Ohio. The appellant, the Columbus Iron & Steel Company, is an Ohio corporation and a resident of that state, owning and operating, however, coal mines in the Kanawha district in the state of West Virginia, whence it ships the products of its mines over the line of the appellee to the lake ports in Ohio.

On the 10th day of April, 1909, the appellant filed its bill against the appellee in the Circuit Court of the United States for the Southern District of West Virginia, praying an injunction to prevent the appellee from filing a new schedule of rates on Lake coal from the Kanawha district, upon the ground that the proposed schedule was unreasonable and discriminatory. The main allegations of the bill were that the then existing rate on Lake coal was reasonable; that the trade and commerce of the appellant had been built up upon the faith of the continuance of the pre-existing rate; that a change to the proposed rate would destroy its business and operate as a discrimination in the Lake trade in favor of certain coal districts in the states of Ohio and Pennsylvania; that the establishment of the proposed rate was for the purpose of preventing a railroad war; and that it was the result of a conspiracy between certain other railway companies owning an interest in the appellee to coerce it into the establishment of the proposed rate, in violation of the Sherman anti-trust law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

Upon the presentation of the bill, a preliminary restraining order was granted as prayed, and the application for an injunction was set down for hearing on the 23d day of April, 1909. Upon the hearing the railway company appeared and demurred to the bill, and moved the court to discontinue the preliminary restraining order, upon the ground that the court was without jurisdiction and the bill without equity. After full argument, a decree was entered on the 29th day of May, 1909, denying the injunction, discontinuing the preliminary restraining order, and dismissing the plaintiff's bill, from which decree the appeal to this court was allowed.

Z. T. Vinson (Vinson & Thompson, on the brief), for appellant.

John H. Holt (James H. Hoyt and Holt & Duncan, on the brief), for appellee.

Before PRITCHARD, Circuit Judge, and WADDILL and CONNOR, District Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). The court below held that it did not have jurisdiction of the subject-matter of this controversy, dissolved the temporary restraining order, and dismissed the bill. The learned judge who heard this case, after a careful review of the authorities bearing upon this question, said:

"I conclude, therefore, that a proper construction of the act of February 4, 1887, forbids the exercise of jurisdiction in a case like the present, because it is inconsistent with the purposes of that act as expressed therein, and as construed and expounded by the Supreme Court of the United States in the leading cases of Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426 [27 Sup. Ct. 350, 51 L. Ed. 553]; Southern Ry. Co. v. Tift, 206 U. S. 428 [27 Sup. Ct. 700, 51 L. Ed. 1124]."

This is a clear and concise statement of the question to be determined. In other words, is the relief sought by the appellant compatible with the act to regulate commerce? Does the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), as it now stands, contemplate that the Interstate Commerce Commission shall have, primarily, exclusive jurisdiction over matters pertaining to fixing rates and determining as to whether the rates filed by the

railroads are fair and just? From an examination of the interstate commerce act it is apparent that the carrier alone can initiate the proposed rate. A rate thus proposed, after having been filed in the office of the Interstate Commerce Commission for the term of 30 days, becomes effective, and at that time the Interstate Commerce Commission assumes complete jurisdiction over the subject-matter. It has been repeatedly held that the fixing of rates is a legislative, and not a judicial, function, and in this instance Congress has provided that the carrier shall, in the first instance, establish the rate. In the case of Southern Pacific Co. v. Colorado Fuel & Iron Co., 101 Fed. 779, 42 C. C. A. 12, the Circuit Court of Appeals for the Eighth Circuit, passed upon this question. The fourth section of the syllabus in that case reads as follows:

"It is not within the legitimate province of a court of equity, in a controversy between interstate carriers and shippers, to interpose and fix a maximum freight rate, either upon an independent consideration of what is a reasonable charge or by relation to some other rate then or theretofore in force, and thereupon enjoin the carrier from demanding more than the rate so established, inasmuch as such an order effectually deprives an interstate carrier of the right to fix its rates in the first instance, and to change the same, which power, as it seems, is conceded to the carrier by the interstate commerce act."

Thus we have the rule clearly stated, and, from the very nature of things, we are forced to the conclusion that the construction thus placed upon this statute is the proper one, in view of the provisions of the interstate commerce act. The Supreme Court of the United States in the case of Baltimore & Ohio R. Co. et al. v. United States of America ex rel. Pitcairn Coal Company, 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. ——, decided at the October term, 1909, in discussing this question, said:

"One of the assignments of error assails the correctness of the conclusion of the court below to the effect that, compatibly with the act to regulate commerce, there was power under the circumstances disclosed by the record to consider the subject-matters which were complained of, and to award the relief concerning them which was prayed. Indeed, the nature of the controversy and the relief which it requires is such that, even without the assigned error, to which we have referred, the question at the very threshold necessarily arises and commands our attention as to whether there was power in the courts, under the circumstances disclosed by the record, to grant the relief prayed consistently with the provisions of the act to regulate commerce, and to that subject we therefore at once come.

"To a consideration of this question it is essential to at once summarily and accurately fix the subject-matter of the alleged grievances and the precise character of the relief required, in order to remedy the evils complained of upon the assumption of their existence. As to the first, it is patent that the grievances involve acts of the Baltimore & Ohio Railroad, regulations adopted by that company, and alleged dealings by the other corporations, all of which, it is asserted, concerned interstate commerce, and all of which, it is alleged, are in direct violation of the duty imposed upon the railroad company by the provisions of the act to regulate commerce. As to the second, in view of the nature and character of the acts assailed, of the prayer for relief which we have previously excerpted, and of the relief which the court below directed to be awarded, it is equally clear that a prohibition by way of mandamus against the act is sought, and an order by way of mandamus was invoked and was allowed, which must operate by judicial decree upon all the numerous parties and various interests as a rule or regulation as to the matter complained of for the conduct of interstate commerce in the future. When the situation is thus defined, we see no escape from the conclusion that the grievances complained of were primarily within the administrative competency of the Inter-

state Commerce Commission, and not subject to be judicially enforced, at least until that body, clothed by the statute with authority on the subject, had been afforded by a complaint made to it the opportunity to exert its administrative functions.

"The controversy is controlled by the considerations which governed the ruling made in Texas & Pacific Railroad Company v. Abilene Cotton Oil Company, 204 U. S. 426 [27 Sup. Ct. 350, 51 L. Ed. 553]. In that case suit was brought in a court of the state of Texas to recover, because of an exaction by a carrier, on an interstate shipment, of an alleged unreasonable rate, although the rate charged was that stated in the schedules duly filed and published in accordance with the act to regulate commerce. After great consideration it was held that the relief prayed was inconsistent with the act to regulate commerce, since by that act the rates as filed were controlling until they had been declared to be unreasonable by the Interstate Commerce Commission on a complaint made to that body. It was pointed out that any other view would give rise to inextricable confusion, would create unjust preferences and undue discriminations, would frustrate the purposes of the act, and, in effect, cause the act to destroy itself. The ruling there made dealt with the provisions of the act as they existed prior to the amendments adopted in 1906, and when those amendments are considered they render, if possible, more imperative the construction given to the act by that ruling, since by section 15, as enacted by the amendment of June 29, 1906 [Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1909, p. 1158)], the Commission is empowered—indeed, it is made its duty—in disposing of a complaint, not only to determine the legality of the practice alleged to give rise to an unjust preference or an undue discrimination, and to forbid the same, but, moreover, to direct the practice to be followed as to such subject for a future period, not exceeding two years, with power in the Commission, if it finds reason to do so, to suspend, modify, or set aside the same; the order, however, to become operative without judicial action. In considering section 15 in the case of Interstate Commerce Commission v. Illinois Central Railroad Company, just decided [215 U. S. 452, 30 Sup. Ct. 155, 54 L. Ed. ——], it was pointed out that the effect of the section was to cause it to come to pass that courts, in determining whether an order of the Commission should be suspended or enjoined, were without power to invade the administrative functions vested in the Commission, and therefore could not set aside an order duly made on a mere exercise of judgment as to its wisdom or expediency. Under these circumstances it is apparent, as we have said, that these amendments add to the cogency of the reasoning which led to the conclusion in the Abilene Case that the primary interference of the courts with the administrative functions of the Commission was wholly incompatible with the act to regulate commerce. This result is easily illustrated. A particular regulation of a carrier engaged in interstate commerce is assailed in the courts as unjustly preferential and discriminatory. Upon the facts found the complaint is declared to be well founded. The administrative powers of the Commission are invoked concerning the regulation of like character upon a similar complaint. The Commission finds, from the evidence before it, that the regulation is not unjustly discriminatory. Which would prevail? If both, then discrimination and preference would result from the very prevalence of the two methods of procedure. If, on the contrary, the Commission was bound to follow the previous action of the courts, then it is apparent that its power to perform its administrative functions would be curtailed, if not destroyed. On the other hand, if the action of the Commission was to prevail, then the function exercised by the court would not have been judicial in character, since its final conclusion would be susceptible of being set aside by the action of a mere administrative body. That these illustrations are not imaginary is established, not only by this record, but by the record in the case of Interstate Commerce Commission v. Illinois Central Railroad Company.

"We say this record, because, as has been pointed out, one of the questions which we would be called upon to decide if the merits were open is whether the court below was right in holding that, if anything but the physical capacity of a mine was taken into consideration by a railroad company in rating the mine for car distribution in time of car shortage, the act to regulate commerce would be violated, and therefore the system adopted by the Baltimore

& Ohio Railroad Company was repugnant to the act, because it made, not alone the physical capacity, but past shipments, factors to be considered. But the reports of the Interstate Commerce Commission show that on a complaint made to that body on the subject of the system of mine rating of the Baltimore & Ohio Railroad Company, the Commission, before the decision of the Circuit Court of Appeals in this case was announced, had expressly refused to hold that the system was either preferential or prejudicial within the act to regulate commerce. In that report, speaking of the Baltimore & Ohio system of mine rating, it was said (Rail & River Coal Co. v. Baltimore & O. R. Co., 14 Interst. Com. Com'n R. 94): 'This method of rating mines was adopted by the defendant in 1902, after a careful examination of the various systems in force on other lines. It was intended as a compromise between ratings based on physical capacity only and ratings based on commercial capacity only.' And after elaborately weighing the matter it was said (page 95): 'In combining the two systems the defendant has adopted the middle ground, apparently upon the thought that neither the physical nor the commercial capacity is always a fair test. We are not prepared, on this record, to say that there is no force in that view, and that a system of mine rating based upon a combination of the physical and commercial capacities of the several mines does not more closely approximate the actual car requirements of the mines than a system based upon physical capacity only.'

"We say, also, the Illinois Central Case, since it is shown in that case that when the railroad company changed its regulations presumably to have them conform to the administrative ruling made by the Commission in the Hocking Valley Case, such change was prevented from going into effect by an injunction issued by the Circuit Court of the United States for the Northern District of Illinois in the Majestic Coal Company Case. And when the Commission came to discharge its duty upon the complaint made to it in the Illinois Central Case it was put to the alternative of either abdicating its administrative duties or making an order in violation of the injunction. And the destructive effect upon the system of regulation devised by the act to regulate commerce, which these illustrations show must be the result of construing that act as giving authority to the courts, without the preliminary action of the Commission, to consider and pass upon the administrative questions which the statute has primarily confided to that body, may be greatly multiplied. This is shown by the opinion of the Commission in the Baltimore & Ohio Case, to which we have already referred, where the decisions of other lower courts are referred to in conflict with the opinion of the court below in this case as to mine rating, and not in harmony with the views expressed by the Commission in the Baltimore & Ohio Case."

In the case of Macon Grocery Company et al. v. Atlantic Coast Line Railroad Company et al., 215 U. S. 501, 30 Sup. Ct. 184, 54 L. Ed. ——, decided at the October, 1909, term of the Supreme Court of the United States, the appellants instituted a suit in equity against the defendants, and the relief sought was a decree enjoining them from putting into force and maintaining in the state of Georgia certain rates established by agreement among themselves. In that case the Circuit Court of Appeals for the Fifth Circuit held that the court below was without jurisdiction. The case was then heard by the Supreme Court on appeal, and that court affirmed the judgment of the Circuit Court of Appeals, but did not base its opinion upon the question now before us.

The ruling of the Supreme Court in the foregoing cases is decisive of the question presented. It is contended with much force that the complainant, pending a determination of the question involved herein by the Interstate Commerce Commission, will suffer irreparable injury, and that it will be compelled to suspend business, owing to the alleged unfair competition involved in the proposed rates, and that the injury thus sustained will be of such a character that a judgment for dam-

ages cannot fully compensate it for the losses it may sustain. While this may be true, nevertheless, it is the duty of the court to construe the law as it finds it. It is not within our province to repeal a law that may be objectionable. Neither can the court exceed the limitations fixed by Congress in defining its jurisdiction.

For the reasons hereinbefore stated, we are of opinion that the judgment of the lower court should be affirmed.